# Unpublished Cases

LEXSEE 2005 TEX. LEXIS 196

CREDITWATCH, INC. & HAROLD E. "SKIP" QUANT, PETITIONERS v.
DENISE JACKSON, RESPONDENT

NO. 02-1076

SUPREME COURT OF TEXAS

*2005 Tex. LEXIS 196; 48 Tex. Sup. J. 425; 22 I.E.R. Cas. (BNA) 821*

October 19, 2004, Argued
February 25, 2005, Delivered

**NOTICE:** [*1] PUBLICATION STATUS PENDING. CONSULT STATE RULES REGARDING PRECEDENTIAL VALUE.

**PRIOR HISTORY:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS. *Jackson v. Creditwatch, Inc., 84 S.W.3d 397, 2002 Tex. App. LEXIS 6424 (Tex. App. Fort Worth, 2002)*

**DISPOSITION:** Reversed in part. Judgment rendered.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Respondent employee sued petitioners, her employer and its chief executive officer (CEO), for intentional infliction of emotional distress based on the CEO's sexual advances and retaliatory conduct. The trial court granted summary judgment to petitioners. The Court of Appeals for the Second District of Texas affirmed as to pre-termination conduct but reversed as to post-termination conduct. Petitioners sought review.

**OVERVIEW:** Initially, the employee alleged sexual harassment under the Texas Commission on Human Rights Act (TCHRA), *Tex. Lab. Code Ann. § 21.001-.556*, but she withdrew those claims when petitioners moved for summary judgment based on limitations. In reversing the appellate decision as to post-termination conduct, the court found that none of the employee's intentional-infliction allegations were viable because her complaints were covered by statutory remedies. Even if TCHRA did not preempt common-law torts, intentional infliction of emotional distress was a "gap-filler" tort. Other remedies, even if barred, left no gap to fill. The court also found that the post-termination actions were not sufficiently outrageous to constitute intentional infliction. Those actions included refusing to provide references, forbidding employees to contact ex-employees, and orchestrating a post-termination eviction. As to the eviction, the court noted that claims for wrongful eviction and tortious interference with contract did not allow mental anguish damages. Intentional infliction claims could not be used to circumvent the limits placed on the recovery of mental anguish damages under more established torts.

**OUTCOME:** The court reversed that part the court of appeals' judgment remanding the employee's claims and rendered judgment that she take nothing.

**LexisNexis(R) Headnotes**

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN1] Intentional infliction of emotional distress is a gap-filler tort never intended to supplant or duplicate existing statutory or common-law remedies.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN2] On a claim of intentional infliction of emotional distress, it is for the court to determine in the first instance whether conduct is extreme and outrageous, and such claims are submitted to a jury only when reasonable minds may differ.

*Labor & Employment Law > Employer Liability > Tort Liability > Intentional Torts*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN3] Intentional infliction of emotional distress claims do not extend to ordinary employment disputes.

*Labor & Employment Law > Employer Liability > Tort Liability > Intentional Torts*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN4] While post-termination conduct may constitute intentional infliction of emotional distress if it goes beyond all possible bounds of decency, ordinary post-termination disputes are insufficient to support liability.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN5] A personal vendetta is insufficient to constitute intentional infliction of emotional distress if the act taken was not outrageous.

*Real & Personal Property Law > Landlord & Tenant > Eviction Actions*
[HN6] Roommates -- sadly, even family members -- may find mutual living arrangements unsuitable, and juries generally need not decide which evictions are tortious.

*Real & Personal Property Law > Landlord & Tenant > Eviction Actions*
*Torts > Business & Employment Torts > Interference With a Contract*
*Torts > Damages > Pain & Suffering*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN7] Texas law recognizes claims for wrongful eviction and tortious interference with contract, neither of which allow mental anguish damages. Tex. Prop. Code Ann. § 92.0081. Intentional infliction claims cannot be used to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
[HN8] The tort of intentional infliction of emotional distress was never intended as an easier and broader way to pursue claims already protected by expanding civil and criminal laws. If the tort is to remain viable where gaps still remain, litigants and judges cannot entertain it as a catch-all that avoids the careful balancing behind alternate legal claims.

**JUDGES:** JUSTICE BRISTER delivered the opinion of the Court.

**OPINIONBY:** Scott Brister

**OPINION:**

For the tenth time in little more than six years, we must reverse an intentional infliction of emotional distress claim for failing to meet the exacting requirements of that tort. n1

   n1 *See Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 441, 47 Tex. Sup. Ct. J. 981 (Tex. 2004); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 737, 46 Tex. Sup. Ct. J. 1116 (Tex. 2003) (per curiam); *Tiller v. McLure*, 121 S.W.3d 709, 710-11, 46 Tex. Sup. Ct. J. 632 (Tex. 2003) (per curiam); *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 606, 45 Tex. Sup. Ct. J. 1245 (Tex. 2002); *Bradford v. Vento*, 48 S.W.3d 749, 751-52, 44 Tex. Sup. Ct. J. 655 (Tex. 2001); *City of Midland v. O'Bryant*, 18 S.W.3d 209, 211, 43 Tex. Sup. Ct. J. 884 (Tex. 2000); *Brewerton v. Dalrymple*, 997 S.W.2d 212, 213-14 (Tex. 1999); *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 63, 42 Tex. Sup. Ct. J. 274 (Tex. 1998); *Southwestern Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 53, 41 Tex. Sup. Ct. J. 930 (Tex. 1998) (per curiam).

[*2]

Denise Jackson filed suit against Creditwatch, Inc. and its chief executive officer, Harold E. "Skip" Quant, on June 17, 1996. n2 Initially, she alleged numerous acts of sexual harassment in violation of the *Texas Commission on Human Rights Act* (TCHRA), n3 but withdrew those claims when the defendants moved for summary judgment based on limitations. n4

   n2 Jackson's suit was joined by Brenda Simcox, and later by Terri Blevins, both Creditwatch employees asserting similar claims. After the trial court granted summary judgment on Jackson's claims, the other employees' claims were settled during trial.

   n3 *See* TEX. LAB. CODE §§ 21.001-.556.

   n4 *See id.* § 21.202 (requiring administrative complaint to be filed within 180 days of occurrence); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492, 39 Tex. Sup. Ct. J. 638 (Tex. 1996) (per curiam) (holding failure to file timely administrative complaint bars suit).

In her amended complaint, Jackson alleged only an intentional [*3] infliction of emotional distress claim, still based on Quant's sexual advances and on retaliatory conduct allegedly continuing even after her termination

on January 3, 1995. The defendants continued to press their motion for summary judgment, asserting the sole remaining claim was barred by (1) preemption, (2) limitations, and (3) no evidence of outrageous conduct. The trial court granted the motion, and Jackson appealed.

The court of appeals (one justice dissenting) affirmed the summary judgment as to pre-termination conduct, holding Jackson's affidavits described an "unpleasant and uncomfortable" workplace but not "the ring of hell" required to establish an intentional infliction claim. n5 But the court reversed and remanded for trial her infliction claim based on post-termination conduct. n6 Applying the usual standard of review, n7 we reverse for two of the reasons stated in the defendants' motion. n8

n5 *84 S.W.3d 397, 407*.

n6 *Id. at 407-08*.

n7 *See Schneider Nat'l Carriers, Inc. v. Bates, 147 S.W.3d 264, 290 n.137, 48 Tex. Sup. Ct. J. 6 (Tex. 2004)* (citing *Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215-16, 47 Tex. Sup. Ct. J. 174 (Tex. 2003)* (reviewing summary judgment de novo, viewing all evidence in nonmovant's favor to see if no genuine issue of material fact exists and movant is entitled to judgment as a matter of law)). [*4]

n8 On the third, limitations, the court of appeals held Quant's acts more than two years before suit could not form the basis for damages, but were admissible as "background and context." *84 S.W.3d at 405*. As the defendants do not appeal that ruling, we do not reach the court of appeals' invocation of the "continuing tort doctrine," a doctrine we have neither endorsed nor addressed, but that has been used by some courts of appeals to toll limitations until the last act of intentional infliction occurs. *See Toles v. Toles, 45 S.W.3d 252, 262 (Tex. App.--Dallas 2001, pet. denied); Newton v. Newton, 895 S.W.2d 503, 506 (Tex. App.--Fort Worth 1995, no writ); Twyman v. Twyman, 790 S.W.2d 819, 821 (Tex. App.--Austin 1990), rev'd on other grounds, 855 S.W.2d 619, 36 Tex. Sup. Ct. J. 827 (Tex. 1993)*.

First, assuming the court of appeals is correct that nothing in the TCHRA preempts other common-law causes of action, n9 the tort involved here nevertheless has its own boundaries. As we recently reiterated, [HN1] intentional infliction of emotional [*5] distress is a "gap-filler" tort never intended to supplant or duplicate existing statutory or common-law remedies. n10 Even if other remedies do not explicitly preempt the tort, their availability leaves no gap to fill.

n9 *84 S.W.3d at 403*.

n10 *Zeltwanger, 144 S.W.3d at 447*.

Here, Jackson's complaints all stemmed from Quant's lewd advances, including the subsequent retaliation that often follows when offensive advances are refused. n11 Jackson suggests no other reason for Quant's actions. As her complaints are covered by other statutory remedies, she cannot assert them as intentional infliction claims just because those avenues may now be barred. n12

n11 *See id. at 448-49*.

n12 *Id. at 447*.

Second, we disagree with the court of appeals' conclusion that some of [*6] the defendants' post-termination actions were sufficiently outrageous to constitute intentional infliction. [HN2] It is for the court to determine in the first instance whether conduct is extreme and outrageous, and such claims are submitted to a jury only when reasonable minds may differ. n13 Even assuming the acts alleged here were independent of Jackson's sexual harassment claims, n14 they do not rise to the level necessary to establish the tort.

n13 *Id. at 445*; *GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 616, 42 Tex. Sup. Ct. J. 907 (Tex. 1999)*.

n14 *See Zeltwanger, 144 S.W.3d at 448-49* (expressing skepticism but not deciding whether subsequent retaliatory acts were independent of sexual harassment claim).

The court of appeals recognized that [HN3] intentional infliction claims do not extend to ordinary employment disputes, n15 but concluded that such disputes end upon termination. n16 But some employment disputes are not so easily ended. n17 As a result, [HN4] while post-termination conduct [*7] may constitute intentional infliction if it goes "beyond all possible bounds of decency," n18 "ordinary" post-

termination disputes are insufficient to support liability. n19

n15 *84 S.W.3d at 405-06*; see also *GTE Southwest, 998 S.W.2d at 612-13*.

n16 *84 S.W.3d at 407*.

n17 See *Tex. Farm Bureau Mut. Ins. Cos. v. Sears, 84 S.W.3d 604, 612, 45 Tex. Sup. Ct. J. 1245 (Tex. 2002)* (holding employer's post-termination reports about employee to federal and state agencies insufficient to establish intentional infliction absent proof that employer violated any laws or knew reports were false); *Wornick Co. v. Casas, 856 S.W.2d 732, 735-36, 36 Tex. Sup. Ct. J. 1136 (Tex. 1993)* (holding that having security guard escort terminated employee from premises insufficient to establish intentional infliction).

n18 *Zeltwanger, 144 S.W.3d at 445* (citing *Twyman v. Twyman, 855 S.W.2d 619, 621, 36 Tex. Sup. Ct. J. 827 (Tex. 1993))* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).

n19 *Sears, 84 S.W.3d at 611*; see also *Wornick, 856 S.W.2d at 735* (holdings acts within legal rights cannot constitute outrageous behavior).

[*8]

Here, Jackson alleged that Quant refused to give her a reference letter, and other Creditwatch employees declined to take reference calls on her behalf during business hours. She also complains of a company-wide email stating a general policy forbidding employees to contact ex-employees. Even assuming all of these actions were the result of a vendetta directed at Jackson, we hold this post-termination conduct is legally insufficient. n20

n20 See *Sears, 84 S.W.3d at 612* (holding [HN5] personal vendetta insufficient to constitute intentional infliction if act taken was not outrageous); see also RESTATEMENT (SECOND) OF TORTS § 46 cmt. g ("The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.").

Finally, the court of appeals reversed based on a post-termination eviction allegedly orchestrated by Creditwatch. [*9] Shortly before her termination, Jackson had moved out of corporate housing due to financial difficulties, and into the home of another Creditwatch manager, Terri Blevins, who provided shelter *gratis*. Viewing the evidence in the light most favorable to Jackson, two months after the termination Quant told Blevins to evict Jackson, and implied that Blevins' own job was in jeopardy if she did not. Blevins complied, and Jackson moved elsewhere the next day.

Assuming all this is true, it was callous, meddlesome, mean-spirited, officious, overbearing, and vindictive -- but not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." n21 [HN6] Roommates -- sadly, even family members -- may find mutual living arrangements unsuitable, and juries generally need not decide which evictions are tortious absent conditions much more "intolerable" than those involved here. Moreover, [HN7] Texas law already recognizes claims for wrongful eviction and tortious interference with contract, neither of which allow mental anguish damages. n22 Intentional infliction claims cannot be used [*10] "to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." n23 Accordingly, we hold Jackson may not assert such a claim here.

n21 *Zeltwanger, 144 S.W.3d at 445* (citing *Twyman, 855 S.W.2d at 621*) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d).

n22 See TEX. PROP. CODE § 92.0081 (providing for lockout damages of one month's rent plus $ 500, actual damages, court costs, and reasonable attorney's fees); *Am. Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp., 798 S.W.2d 274, 278, 34 Tex. Sup. Ct. J. 20 (Tex. 1990)* (holding damages for tortious interference with contract are the same as damages for breach of contract interfered with, thus putting claimant in same economic position as if contract had been performed).

n23 *Zeltwanger, 144 S.W.3d at 447* (quoting *Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 68, 42 Tex. Sup. Ct. J. 274 (Tex. 1998))*.

[*11]

* * *

We certainly understand judicial reticence to dismiss claims like this one stemming from heinous acts. But

except in circumstances bordering on serious criminal acts, we repeat that such acts will rarely have merit as intentional infliction claims. n24

> n24 *See, e.g., Morgan v. Anthony, 27 S.W.3d 928, 930-31, 43 Tex. Sup. Ct. J. 1172 (Tex. 2000); GTE Southwest v. Bruce, 998 S.W.2d 605, 613-14, 617, 42 Tex. Sup. Ct. J. 907 (Tex. 1999).*

[HN8] This tort was never intended as an easier and broader way to pursue claims already protected by our expanding civil and criminal laws. If the tort is to remain viable where "gaps" still remain, litigants and judges cannot entertain it as a catch-all that avoids the careful balancing behind alternate legal claims.

Accordingly, we reverse that part the court of appeals' judgment remanding Jackson's claims, and render judgment that she take nothing.

Scott Brister

Justice

LEXSEE 109 FED. APPX. 685

**LORRAINE WASHINGTON, ET AL, Plaintiffs, LORRAINE WASHINGTON, Plaintiff-Appellant v. ANN VENEMAN, SECRETARY, DEPARTMENT OF AGRICULTURE, Defendant-Appellee**

No. 04-30233 Summary Calendar

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*109 Fed. Appx. 685; 2004 U.S. App. LEXIS 19942*

**September 23, 2004, Filed**

**NOTICE:** [**1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Louisiana. No. 02-CV-02678-K. *Washington v. Veneman, 2004 U.S. Dist. LEXIS 1066 (E.D. La., Jan. 27, 2004)*

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed an action against defendant, the Secretary of the U.S. Department of Agriculture, alleging that she was subjected to race and sex discrimination and retaliation in violation of *42 U.S.C.S. §§ 2000e-2(a), 2000e-3(a), 2000e-16(a)*. The employee appealed after the United States District Court for the Eastern District of Louisiana granted the Secretary's dismissal and summary judgment motions.

**OVERVIEW:** The employee claimed that she was discriminated against in violation of Title VII of the Civil Rights Act of 1964. The district court granted the Secretary's *Fed. R. Civ. P. 12(b)(6), 56*, motions. It found that the only possibly valid legal claims asserted by the employee were claims for failure to promote and two leave-related claims. It held that those claims were not actionable and that, alternatively, the Secretary was entitled to summary judgment as to them. The court noted that in the Fifth Circuit, only ultimate adverse employment actions could be the subject of disparate treatment and retaliation claims. Most of the employee's claims were properly dismissed because they did not pertain to ultimate adverse employment actions. Summary judgment was properly granted as to the promotion and leave-related claims because, even if the employee had made a prima facie showing of discrimination, the Secretary had presented ample evidence showing legitimate, nondiscriminatory reasons for the decisions made. The employee had not presented any evidence showing that the explanations given were pretexts for discrimination, and no rational factfinder would find that such pretext existed.

**OUTCOME:** The court affirmed the district court's judgment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] The United States Court of Appeals for the Fifth Circuit reviews *Fed. R. Civ. P. 12(b)(6)* dismissals for failure to state a claim de novo. The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. The court should not dismiss a claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that the plaintiff could prove consistent with the allegations in the complaint.

*Civil Procedure > Summary Judgment > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN2] The United States Court of Appeals for the Fifth Circuit reviews a district court's grant of summary judgment de novo, applying the same standard as the district court.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The moving party is entitled to a judgment as a matter of law if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN4] The McDonnell Douglas burden-shifting framework governs a plaintiff's Title VII of the Civil Rights Act of 1964 (Title VII) claims for disparate treatment. Under this framework, a Title VII plaintiff bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. Although the precise articulation of the elements of a prima facie case will vary according to the facts of the case and the nature of the claim, a plaintiff usually satisfies this initial burden by showing that: (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the employer continued to seek applicants with the plaintiff's qualifications, the employer selected someone of a different race or sex, or that others similarly situated were treated more favorably than she.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN5] The McDonnell Douglas framework applies where a plaintiff offers only circumstantial evidence to support her disparate treatment claims.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN6] Under the McDonnell Douglas burden-shifting framework, once established, a plaintiff's prima facie case raises an inference of intentional discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant proffers such a legitimate reason, the burden shifts back to the plaintiff to show that the defendant's reason was merely a pretext for discrimination. Of course, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN7] Whether summary judgment is appropriate as to a plaintiff's Title VII of the Civil Rights Act of 1964 disparate treatment claims depends on a number of factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Retaliation*
[HN8] Where a plaintiff's claims for retaliation also fall within the McDonnell Douglas burden-shifting framework, the plaintiff carries the initial burden of establishing a prima facie case of retaliation A plaintiff may satisfy this burden by demonstrating that: (1) she engaged in an activity protected by Title VII of the Civil Rights Act of 1964, (2) an adverse employment action was taken against her, and (3) a causal link existed between the protected activity and the adverse employment action.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Retaliation*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN9] The McDonnell Douglas framework applies where a plaintiff bases her Title VII of the Civil Rights Act of 1964 retaliation claims solely on circumstantial evidence. In direct evidence cases, the burden of proof shifts to the employer to establish by a preponderance of evidence that the same decision would have been made regardless of the protected activity. A plaintiff's prima facie showing of retaliation establishes an inference of the employer's impermissible retaliatory motive. Like in disparate treatment cases, the burden then shifts to the employer to produce a legitimate, nonretaliatory reason for the adverse employment action. Once the employer produces evidence of such a reason, the plaintiff has the ultimate burden of proving that the protected activity was a but-for cause of the adverse employment decision. A jury may infer the existence of but-for causation from the combination of the plaintiff's evidence establishing the

prima facie case of retaliation and the plaintiff's evidence that the reasons given by the employer are merely pretextual.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Retaliation*
*Labor & Employment Law > Discrimination > Disparate Treatment > Working Conditions*
[HN10] In order to present a prima facie case for either disparate treatment or retaliation, a plaintiff must show that the employer took an adverse employment action against the plaintiff. In the Fifth Circuit, only ultimate employment decisions qualify as the adverse employment actions necessary to establish a prima facie case of discrimination or retaliation. Title VII of the Civil Rights Act of 1964 is designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions. Ultimate employment decisions include hiring, granting leave, discharging, promoting, and compensating. The definition of ultimate employment actions in retaliation cases is derived from the definition of discrimination in disparate treatment cases.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN11] A court of appeals may affirm on any grounds supported by the record when reviewing a district court order de novo.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN12] Conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy a nonmovant's burden in a motion for summary judgment.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Retaliation*
*Labor & Employment Law > Discrimination > Disparate Treatment > Working Conditions*
[HN13] The fact that the selecting official ultimately offers a promotion to an African-American man, a White woman, and a Hispanic woman provides evidence of the lack of any discriminatory motive. Moreover, where nothing in the record suggests that a promotion panel knew anything about a plaintiff's prior Equal Employment Opportunity Commission complaints, this demonstrates the unlikelihood of a retaliatory motive.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Disparate Treatment > Working Conditions*
[HN14] A showing that an unsuccessful promotion candidate was clearly better qualified is enough to prove that the employer's proffered reasons for its selection are pretextual. Showing that two candidates are similarly qualified does not establish pretext under the McDonnell Douglas burden shifting standard.

**COUNSEL:** For LORRAINE WASHINGTON, Plaintiff-Appellant: Lorraine Washington, Pro se, New Orleans, LA.

For ANN VENEMAN, SECRETARY, DEPARTMENT OF AGRICULTURE, Defendant-Appellee: Sandra Ema Gutierrez, Assistant US Attorney, US Attorney's Office, Eastern District of Louisiana, New Orleans, LA.

**JUDGES:** Before KING, Chief Judge, and SMITH and BENAVIDES, Circuit Judges.

**OPINION:** [*686] PER CURIAM: *

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Plaintiff-Appellant Lorraine Washington appeals the district court's order granting Defendant-Appellee's motion to dismiss and motion for summary judgment in this Title VII [**2] action. For the following reasons, we AFFIRM.

**I. Background**

Lorraine Washington ("Washington"), an African-American female born January 5, 1956, is employed by the United States Department of Agriculture's National Finance Center (the "NFC") in New Orleans, Louisiana. On August 30, 2002, after exhausting her administrative remedies, Washington brought this Title VII lawsuit against U.S. Secretary of Agriculture Anne Veneman ("Veneman"). n1 Washington alleges her employer discriminated against her by, inter alia, failing to promote her, denying her request for leave, denying her additional options to repay religious leave, reprimanding her for reading on the job, denying her the use of a floor heater, requiring her to keep a task list of daily duties, allowing rude behavior from supervisors, giving her undeserved poor performance ratings, denying her a performance award, scheduling training on a Holiday

Program day, threatening disciplinary action, disclosing personal information on an organizational chart, denying adequate work assignments to fill a nine-hour work day, and removing and later replacing items from her desk. Washington claims that her employer discriminated against [**3] her on the basis of race and sex, as well as in retaliation for her various prior Equal Employment Opportunity ("EEO") complaints. n2

> n1 The original complaint was brought on behalf of Washington and ten other NFC employees. On July 17, 2003, the district court granted an unopposed motion to sever the other plaintiffs from Washington's lawsuit.
>
> n2 Washington's complaint also alleged age discrimination, but she no longer maintains that theory on appeal.

On December 16, 2003, Veneman filed a motion to dismiss under *Rule 12(b)(6)* and [*687] for summary judgment under *Rule 56*. On January 27, 2004, the district court granted Veneman's motion. The district court held that all of Washington's discrimination claims except three (failure to promote, denial of a request for leave, and denial of additional options to repay religious leave) clearly failed to state a claim for relief and were therefore dismissed under *Rule 12(b)(6)*. *Washington v. Veneman, 2004 U.S. Dist. LEXIS 1066, No. Civ.A. 02-2678, 2004 WL 170315, at * 5 (E.D.* [**4] *La. 2004)*. Although noting that the leave-based claims (denial of leave and denial of opportunities to repay religious leave) more closely resembled actionable claims under Title VII, the court nevertheless dismissed these claims under *12(b)(6)* as well. See id. As an alternative holding, the court granted summary judgment on the two leave-based claims. Id. Finally, the district court granted summary judgment in favor of Veneman on the failure-to-promote claim. Id. Washington, who was represented by counsel below, now appeals pro se.

## II. Discussion

### A. Standards of Review

[HN1] We review *Rule 12(b)(6)* dismissals for failure to state a claim de novo. *Gregson v. Zurich Am. Ins. Co., 322 F.3d 883, 885 (5th Cir. 2003)*. This court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)*. "Thus, the court should not dismiss [a] claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that [it] could prove consistent with the allegations in the complaint." Id.

[HN2] We also review a district [**5] court's grant of summary judgment de novo, applying the same standard as the district court. *Fierros v. Tex. Dep't of Health, 274 F.3d 187, 190 (5th Cir. 2001)*. [HN3] Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. See *FED. R. CIV. P. 56(c)*; see also *Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001)*. "The moving party is entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (internal quotation marks omitted).

### B. Legal Theories

For each of her various discrimination claims, Washington advances two independent legal theories: disparate treatment (i.e., intentional race and sex discrimination) and retaliation. See *42 U.S.C. §§ 2000e-2(a), 2000e-3(a), 2000e-16(a)* [**6] *(2003)*.

#### 1. Disparate Treatment

[HN4] The McDonnell Douglas burden-shifting framework governs Washington's Title VII claims for disparate treatment. n3 *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under this framework, "[a] Title VII plaintiff bears the initial burden to prove a prima facie case of discrimination by a preponderance of the evidence." *LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 (5th Cir. 1996)* (citing *McDonnell Douglas, 411 U.S. at 802*). Although the precise articulation of the elements of a prima [*688] facie case will vary according to the facts of the case and the nature of the claim, a plaintiff usually satisfies this initial burden by showing that: (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the employer continued to seek applicants with the plaintiff's qualifications, the employer selected someone of a different race or sex, or that others similarly situated were treated more favorably than she. *Id. at 448 & n.3*; *Evans v. City of Houston, 246 F.3d 344, 348-50 (5th Cir. 2001)*; [**7] *Rios v. Rossotti, 252 F.3d 375, 378 (5th Cir. 2001)*; *Urbano v. Cont'l Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998)*.

> n3 [HN5] The McDonnell Douglas framework applies here because Washington offers only circumstantial evidence to support her disparate treatment claims. *Evans v. City of*

*Houston, 246 F.3d 344, 348-50 (5th Cir. 2001)*; see also *Kendall v. Block, 821 F.2d 1142, 1145 (5th Cir. 1987)*.

[HN6] "Once established, the plaintiff's prima facie case raises an inference of intentional discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action." *LaPierre, 86 F.3d at 448* (citing *McDonnell Douglas, 411 U.S. at 802*). If the defendant proffers such a legitimate reason, the burden shifts back to the plaintiff to show that the defendant's reason was merely a pretext for discrimination. *Rios, 252 F.2d at 378* [**8] (citing *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 138-42, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000))*. Of course, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves, 530 U.S. at 143* (alteration in original) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981))*. [HN7] Whether summary judgment is appropriate depends on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id. at 148-49.*

### 2. Retaliation

Washington's [HN8] claims for retaliation also fall within the *McDonnell Douglas* burden-shifting framework. n4 See *Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191-92 (5th Cir. 2001)*. Accordingly, "the plaintiff carries the initial burden of establishing a prima facie case of retaliation." Id. A plaintiff may satisfy this burden by demonstrating that: (1) she engaged [**9] in an activity protected by Title VII, (2) an adverse employment action was taken against her, and (3) a causal link existed between the protected activity and the adverse employment action. Id.; *Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)*.

n4 Again, [HN9] the McDonnell Douglas framework applies because Washington bases her retaliation claims solely on circumstantial evidence. *Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191-92 (5th Cir. 2001)* (noting that in direct evidence cases, the burden of proof shifts to the employer to establish by a preponderance of evidence that the same decision would have been made regardless of the protected activity); *Moore v. United States Dep't of Agric. ex rel. Farmers Home Admin., 55 F.3d 991, 995 (5th Cir. 1995)*.

The plaintiff's prima facie showing of retaliation establishes an inference of the employer's impermissible retaliatory motive. *Fierros, 274 F.3d at 191*. Like in disparate treatment cases, the burden then shifts [**10] to the employer to produce a legitimate, nonretaliatory reason for the adverse employment action. Id. Once the employer produces evidence of such a reason, the plaintiff has the ultimate burden of proving that the protected activity was a but-for cause of the adverse employment decision. *Long, 88 F.3d at 305 n.4*. The jury may infer the existence of but-for causation from the combination of the plaintiff's evidence establishing the prima facie case of retaliation and the plaintiff's evidence that the reasons given by the [*689] employer are merely pretextual. *Mota v. Univ. Tex. Houston Health Sci. Ctr., 261 F.3d 512, 519 (5th Cir. 2001)*.

### 3. Ultimate Employment Actions

We have consistently held that [HN10] in order to present a prima facie case for either disparate treatment or retaliation, a plaintiff must show that the employer took an "adverse employment action" against the plaintiff. See, e.g., *Pegram v. Honeywell, Inc., 361 F.3d 272, 281-82 (5th Cir. 2004)*. In this circuit, only "ultimate employment decisions" qualify as the adverse employment actions necessary to establish a prima facie case of discrimination or retaliation. [**11] *Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997)*; see also *Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995)* (per curiam) ("Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."). Ultimate employment decisions include hiring, granting leave, discharging, promoting, and compensating. *Mattern, 104 F.3d at 707*; *Hernandez v. Crawford Bldg. Material, 321 F.3d 528, 531-32 (5th Cir. 2003)* (per curiam) (explaining that the definition of ultimate employment actions in retaliation cases is derived from the definition of discrimination in disparate treatment cases).

### C. Analysis

#### 1. Claims Not Constituting Ultimate Employment Actions

The district court properly dismissed the vast majority of Washington's claims because the employer's actions did not constitute ultimate adverse employment actions. None of the following actions asserted by Washington constitute ultimate employment actions under our jurisprudence: reprimanding for reading on the

job, denying [**12] the use of a floor heater, requiring an employee to keep a task list of daily duties, rude behavior from supervisors, undeserved poor performance ratings, denying a performance award, scheduling training on a Holiday Program day, threatening disciplinary action, disclosing personal information on an organizational chart, denying adequate work assignments to fill a nine-hour work day, and removing items from the employee's desk and then later replacing them. See, e.g., *Hernandez, 321 F.3d at 532 n.2* (cataloguing Fifth Circuit cases on ultimate employment actions). To find otherwise would transform "every trivial personnel action that an irritable . . . employee did not like [into the] basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial." *Burger v. Cent. Apartment Mgmt., 168 F.3d 875, 879 (5th Cir. 1999)* (per curiam) (quoting *Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996))*. Thus, Washington failed to establish a prima facie case [**13] for either disparate treatment or retaliation with respect to these claims, and the district court did not err in granting Veneman's motion to dismiss.

### 2. Denial of Leave and Opportunity to Repay Leave

The district court also dismissed Washington's claims that she was denied leave and denied the opportunity to repay leave for a religious holiday on the grounds that these denials did not constitute ultimate employment actions. We have previously listed the denial of leave among those employment decisions that may satisfy the ultimate employment action requirement. n5 E.g., *Mattern, 104* [*690] *F.3d at 707*. Notwithstanding the fact that a denial of leave can constitute an ultimate employment action in certain circumstances, we have serious doubts that Washington's particular leave-based claims rise to the level of an ultimate employment decision. We, however, need not decide the issue here. Instead, we affirm the district court's alternative grant of summary judgment on the grounds that Washington failed to meet her burden with respect to these two claims on either a disparate treatment or retaliation theory. Cf. *Okoye v. Univ. Tex. Houston Health Sci. Ctr., 245 F.3d 507 (5th Cir. 2001)* [**14] (noting that [HN11] a court of appeals may affirm on any grounds supported by the record when reviewing a district court order de novo).

n5 We also note that Veneman expressly conceded in her motion to dismiss and motion for summary judgment that these two claims satisfied the ultimate employment action element of a prima facie case.

Even assuming, arguendo, that Washington established a prima facie case for disparate treatment and retaliation for her claim that she was denied leave, Veneman produced ample evidence showing that the NFC had a legitimate, nondiscriminatory, nonretaliatory reason for the denial. In February 1999, following normal procedure, the NFC asked its employees (including Washington) to schedule leave for the year in advance by designating a first and second choice for vacation time. Washington requested vacation during Christmas, without listing a second choice. NFC policy, however, requires employees to alternate working on major holidays because these vacation periods are consistently in high [**15] demand. Because Washington had taken Christmas vacation in 1998, her supervisor asked that she select another time for vacation in 1999. Washington complied with the request, and her second choice for vacation was granted. Thus, the "denial" of leave comported with established internal NFC procedure, and any presumption of discrimination inferred from Washington's prima facie case therefore disappeared.

Consequently, the burden then shifted to Washington to show that this explanation was merely a pretext for discrimination. She failed to present any evidence, much less sufficient evidence, that this was the case. In the same vein, Washington failed to provide any evidence that she would have been granted her request for vacation but-for her prior EEO activity. The only evidence in the record that even possibly questions the legitimacy of the stated reason is Washington's own affidavit that the NFC did not always follow its vacation policy. This statement, by itself, fails to satisfy Washington's summary judgment burden. See *Ramsey v. Henderson, 286 F.3d 264, 269-70 (5th Cir. 2002)* (noting that this court "has cautioned that [HN12] 'conclusory allegations, speculation, and [**16] unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment." (quoting *Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996)))*. Thus, there is no genuine issue of material fact regarding Washington's retaliation claim, and summary judgment was appropriate. See *Long, 88 F.3d at 305 n.4, 308*.

For the same reasons, Washington's claim that she was denied the opportunity to repay leave taken for religious holiday in December 2001 fails. NFC policy allows supervisors to grant employees time-off on regular work days for religious observance. Employees taking such leave, however, must repay the time by working additional hours; otherwise, those hours will be

deducted from the employee's paycheck. The record shows that the NFC provided Washington with the opportunity [*691] to repay the religious leave in question. However, she failed to fill out the necessary forms and was therefore billed for the time she took off. Plaintiff produced no evidence showing that this reason was merely a pretext for discrimination. Furthermore, no evidence suggests that Washington would have been allowed to repay [**17] her religious leave but-for her EEO complaints. Accordingly, Washington failed to meet her summary judgment burden on both of her leave-based claims.

### 3. Failure to promote

Washington similarly failed to meet her summary judgment burden with respect to her claim that the NFC denied her a promotion in July 2000. Even assuming that Washington established a prima facie case, she did not present evidence showing that the NFC's reasons supporting its promotion decision were pretextual or that she would have been promoted but-for her EEO activity. Absent a genuine issue of material fact on the matter, the district court properly granted summary judgment.

In September 1999, the NFC advertised two vacancies for a position as Program Analyst, GS-07/09/11. A promotion panel, consisting of a Personnel Management Specialist (an AfricanAmerican female) and three rating members (a White male, an African-American female, and a White female) reviewed, rated, and ranked the applications. Following NFC procedure, the panel utilized a plan that measured and scored each candidate's proficiency in the four criteria identified in the vacancy announcement. Each candidate received a total score [**18] derived from the four criteria scores. The highest scoring candidates made the Best Qualified ("BQ") list, which was forwarded to the selecting official for the final promotion decision.

Washington applied for both the GS-7 and the GS-9 positions. Of the 54 candidates that applied for the GS-7 promotion, the top nine made the BQ list. The cut-off score was 355. Washington, who scored a 330, did not make the BQ list, and she therefore was not considered for promotion by the selecting official. Of the 24 applicants for the GS-9 position, seven made the BQ list. The cut-off score was 320. Washington scored a 300 and thus did not make the BQ list. From the BQ lists, the selecting official offered promotions to an African-American male, a White female, and a Hispanic female.

Thus, Veneman established a nondiscriminatory, nonretaliatory basis for the NFC's decision not to promote Washington. [HN13] The fact that the selecting official ultimately offered the promotion to an African-American man, a White woman, and a Hispanic woman provides further evidence of the lack of any discriminatory motive. See *Nieto v. L&H Packing Co., 108 F.3d 621, 624 & n.7 (5th Cir. 1997)* (stating that [**19] the fact that a Hispanic male was replaced by another Hispanic male was material, but not outcome determinative, to its conclusion that the employer did not discriminate). Moreover, nothing in the record suggests that the promotion panel knew anything about Washington's prior EEO complaints, thus demonstrating the unlikelihood of a retaliatory motive. *Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 168 (5th Cir. 1999)*. Therefore, Veneman satisfied her burden under *McDonnell Douglas*.

In response, Washington utterly failed to provide any evidence that her non-promotion resulted from race or sex discrimination, that the reasons proffered by the NFC were pretextual, or that she would have been promoted but-for her prior EEO activity. The record shows that a number of candidates, in addition to those ultimately selected, were more qualified than Washington. Specifically, 15 candidates (including the nine who made the BQ [*692] list) outscored Washington in the GS-7 ratings, and 12 applicants (including the seven who made the BQ list) outscored her in the GS-9 ratings. Washington provided no evidence that she was clearly more qualified than the applicants selected, [**20] and therefore her claim for non-promotion must fail. See *Price v. Fed. Express Corp., 283 F.3d 715, 723 (5th Cir. 2002)* ("We have held in previous cases that [HN14] a showing that the unsuccessful employee was clearly better qualified is enough to prove that the employer's proffered reasons are pretextual. . . . Showing that two candidates are similarly qualified does not establish pretext under this standard."); *Odom v. Frank, 3 F.3d 839, 845-47 (5th Cir. 1993)*.

After carefully reviewing the record, we conclude that Washington has failed to offer evidence that, when viewed in the light most favorable to her, would allow a rational fact-finder to make a reasonable inference that the NFC's proffered reasons for its employment actions were merely a pretext for discrimination or retaliation. See *Ramsey 286 F.3d at 269-70*; *Grimes v. Tex. Dep't of Mental Health & Mental Retardation, 102 F.3d 137, 143 (5th Cir. 1996)* (affirming summary judgment because plaintiff offered insufficient evidence to show that the defendant's articulated reasons were pretextual). Hence, the district court did not err in granting summary judgment [**21] in favor of Veneman.

### III. Conclusion

For the forgoing reasons, we AFFIRM the judgment of the district court.